IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


KATRINA BROWN,                                    Case No.: 2:07cv479

                Plaintiff                         Judge Graham

        v.                                        Magistrate Judge Abel

THE OHIO STATE UNIVERSITY, et al.,

                Defendants.


OPINION AND ORDER


        This matter is before the court on a motion for summary judgment, pursuant to Fed. R.

Civ. 56(c) filed by defendants The Ohio State University (OSU) and its President Gordon Gee[1].

Plaintiff is Katrina Brown (Brown), a former employee of OSU.

**I.      Factual Background**

        Plaintiff Katrina Brown is an African-American female who began working for the Ohio

State University Medical Center (OSUMC) in 1992.  Defendant OSU owns and operates OSU

Medical Center East (OSUMC East) and at all relevant times was Brown's employer.  Between

1992 and 2000, Brown was in various nursing and managerial positions at OSUMC.  In March of

2000, Brown transferred to OSUMC East to work as a staff nurse in the operating room. At that

time, Jerry Mansfield (Mansfield) was Administrative Director of Nursing Services at OSUMC

---

[1]      President Gee, who replaced Karen Holbrook as President of OSU,  is sued in his official
capacity which is treated as a suit against the University. See, Tylicki v. Gee, No. 2:08-cv-936,
2009 U.S. Dist. LEXIS 7334, *n1 (S.D. Ohio Jan. 15, 2009).

East and at some point in 2000, Beth Haselwood (Haselwood) became Director of Perioperative

Services at OSUMC East. In 2001, Haselwood promoted Brown to "program manager" and four

months later to "Associate Director of Perioperative Services." The Perioperative Services

Department ("Department") includes pre-op, the operating room (OR), PACU (postoperative

recovery), endoscopy, and central sterile supply (CSS). (doc. 25 p. 17, 22; doc. 30 p. 25).

As Associate Director of the Department, Brown received positive performance

evaluations (referred to simply as a "PACE"). A PACE is a written document that contains an

annual review of an employee's performance by her supervisor. The PACE contains an "overall

summary of performance," including "exceeds expectations," "meets expectations," "needs

improvement," or "unsatisfactory." (See e.g., doc. 23-14). The PACE is also broken down into

categories, such as "Leadership" and "Resource Management," which use the same rating system

but also includes comments from the supervisor regarding the employee's performance.

In early 2004, Haselwood was promoted to Director of Inpatient Services and upon her

recommendation, Jerry Mansfield promoted Brown to succeed Haselwood as Director of

Perioperative Services. The Director is "responsible for managing the operations, evaluating

manager/employee performance, demonstrating customer satisfaction (internal/external). . . and

strategic and operational planning and program development." (doc. 23-12 p. 2). The Director's

duties include developing short and long term goals, effectively communicating and mentoring

staff, developing and implementing programs to improve outcomes, services, operations and

costs, developing and communicating well-defined budget plans and plans cost saving initiatives,

working to improve productivity, identifying opportunities for improvement, and correcting

factors contributing to problematic outcomes in patient care and departmental services. (doc. 23-

12).  According to prior Director Haselwood, the Director is generally responsible for "everything

in the department," including determining the status of the department, looking toward

improvements, planning and implementing plans to move the department forward. (doc. 30-3 p.

19-20).

Approximately five months into her position as Director, in July 2004, Brown received a

PACE evaluation ("2004 PACE")  from Mansfield indicating that she generally  "meets

expectations." (doc. 23-14).   However, under each area of responsibility, he included areas of

concern that Brown was expected to work on over the next year.   For instance, under "Customer

Focus,"  Brown was told to watch for "periop staff/surgeon in tray/sets consistency and materials

management."  (doc. 23-14,  p. 3).  Under "Leadership," Mansfield noted that Brown needed to

"remember to set achievable goals and monitor performance against the goals." (Id).  Mansfield

also noted that Brown needed to "enhance [her] oversight of OR Materials Management," to

facilitate teamwork, and to "follow  through on orthopedic implant pricing."  (Id. p. 4, 5).

Brown signed the 2004 PACE and stated that her goals for the year were to address these

concerns, including staff morale, implant pricing, improving budgetary expenses, and increasing

patient satisfaction.  (Id. p. 6).  In actuality, Brown did not believe that the comments in her 2004

PACE signified any performance problems on her part. (See e.g., doc 23-2,  p. 112-122).  Rather,

she felt the comments reflected Mansfield's failure to understand the Department and/or related to

matters not within her responsibility or control. (doc. 23-2, p. 113; p. 115-118).  There is no

evidence that Brown communicated her opinions or understanding of her role to Mansfield. In

fact, in her deposition, Brown stated that she did not tell Mansfield she disagreed with his

evaluation and areas of concern because he was her boss and would put whatever he wanted in

her PACE. (doc. 23-2 p. 118; p. 140; p. 146, stating, "whatever [Mansfield] said I just, you know, I agreed with..it wasn't going to make a difference what I said"). Brown's main concern with regards to her PACE was whether or not she received "meets expectations" and was unconcerned about the comments placed in her PACE by her supervisor. (doc. 23-2 p. 118).

In January of 2005, the OR nurse manager position was filed, over Brown's objections and upon Mansfield's recommendation, by Mary Ferraro (Ferraro). Brown did not get along with Ferraro and felt that Ferraro was undermining her authority and was hoping to take Brown's position as Director. Brown believes that Ferraro complained to Mansfield about Brown and accordingly, Brown began to feel upset and as though she were being unfairly criticized. She also felt that Mansfield treated her differently than he had Haselwood because, for instance, Brown had no OR nurse manager for a period of time, which Haselwood always had, and because Brown had to share an office with nurse manager Claudia Pratt, while Haselwood had her own office[2].

In August 2005, Brown received another PACE ("2005 PACE") from Mansfield that rated her as "meets expectations" in all categories. When she received the evaluation, Brown was told that if "this same level of performance as described in the evaluation. . . continued, it would not be meets expectation the following year." (doc. 32-3 p. 24; see also doc. 23-2 p. 163). The evaluation also included several detailed comments from Mansfield about areas of concern with both Brown's leadership and with the Department itself, some of which echoed concerns set forth in the 2004 PACE. These included, among other concerns, materials management oversight, staff/surgeon satisfaction, surgical volume, and communication issues. Brown's own goals and areas to watch as set out in her 2005 PACE were to build surgical volume, improve

---

[2]     Notably, Brown's successor as Director, Denise Minor, shared an office with Mansfield for at least some period of time. (doc. 34-6 p. 3).

communication, and to continue to address operational challenges such as block scheduling, equipment issues, and staffing. (doc. 23-15 p. 5).

        In addition, the evaluation required that Brown:

1)     Read the assessment [the assessment was a "Perioperative Services Assessment" prepared by Mansfield, (doc. 23-17), hereinafter referred to as the "Assessment"]

2)     Develop an action plan that includes goals/objectives/ timeframes and responsible parties to improve the specified areas outlined throughout the PACE.

3)     Provide a copy of your plan to your supervisor within 30 days.

4)     Provide a written progress report and meet monthly with your supervisor providing evidence of achievement of mutually agreed upon outcomes.  (doc. 23-15 p. 8).

The Assessment, dated August 2, 2005, was a document created by Mansfield in order to "document assessment findings post review of perioperative operations over the past six months." (doc. 23-17).  The Assessment sets forth various areas of concern within Perioperative Services, including "quality indicators" which were trending in the "wrong direction," including decreased volume in the OR, decrease in antibiotic timeliness, decrease in block time used, increase in case length time, and increased turnover time. (doc. 23-17 p. 2).  In creating the Assessment, Mansfield was hoping to determine "how he could help Brown be successful in her job." (doc. 32-7 at p. 2).

        As part of her 2005 PACE, Brown was also required to create an action plan for the Department.  In general, an action plan is a document that sets forth goals for a department, outcome measure for each goal, tactics and strategies to achieve each goal and a completion date.

Brown testified that, despite the requirement that an action plan be provided within 30 days, Mansfield told her that she did not need to write an action plan because the Assessment did not really concern her. (doc. 23-3 p. 34). She did however create a "response" to the Assessment, which was received after the 30 day deadline. (doc. 23-18; doc. 32-4 p. 1)[3]. The response submitted by Brown addressed the main areas of concern as set forth in the Assessment (such as decreased surgical volume, decrease in the utilization of block time, and increase in turn over time), the person responsible for that area of concern, and "comments" which included goals or plans for addressing the item. For instance, addressing the concern about decreased surgical volume, Brown listed herself as one of many individuals responsible for working on that item and then noted the need to continue to assess surgical satisfaction, continue to work on increasing anesthesia staffing, continue replacing old surgical equipment, and to actively release block time to surgeons. (Id at p. 1). After reviewing her plan, however, Mansfield determined that it was "unsatisfactory to address the issues that had been identified on the evaluation" (doc. 32-4 p. 76) because it needed goals and specific tactics to achieve the goals. (Doc. 32-4 p. 77). Accordingly, he and Brown met to rework the document and Brown provided a revised action plan on October 24, 2005 (approximately thirty days after the original action plan deadline). The new plan was more detailed and contained specific tactics for achieving specific goals, as well as ways to measure whether those goals were being met. (doc. 35-26).

Although Brown agreed to the action plan, she did not feel that it was necessary and that it showed a lack of understanding on Mansfield's part as to how the OR operated. Brown

_____

[3]     In discussing the "response" to the Assessment, Brown does refer to it as an action plan. (doc. 23-3 p. 35; doc. 23-18 p. 10, referring to the response as her "action plan"). However it is not designated as such by title on the document.

alleges that Haselwood and Minor were never required to create an action plan, although Mansfield counters that neither Haselwood nor Minor needed an action plan because they were "effective as directors in their role." (doc. 32-8 p. 22). By November of 2005, Mansfield had determined that Brown was not being successful in the Director position (doc. 35-27) and effective January 1, 2006, Brown was demoted to nurse manager over the OR and central sterile supply[4], an area of the department she specifically chose and which required the displacement of the nurse manager, Mary Ferraro (Caucasian), who was currently in that position, to a position as nurse manager over preop/PACU. (doc. 29-3 p. 19). According to the OR/CSS nurse manager job description, the nurse manager is key in working toward "achievement of patient satisfaction, reduction of the length of hospital stay in regards to the surgical procedure, reduction of supply cost, such as implants, custom packs, instrumentation and other surgical supplies." (doc. 23-26). The duties of the OR/CSS nurse manager include, among many others, developing goals and plans to facilitate goal achievement, maintaining effective communication and problem solving, planning and initiating cost saving initiatives and budgets, and meets quality indicators such as patient satisfaction and unit productivity. (Id). Brown signed the nurse manager job description, but testified that some of the duties listed therein, including reducing the supply cost of implants, were not actually her responsibility. (doc. 23-3 p. 131). Until June of 2006, Brown felt that she continued to perform many of the same functions in her new role as she did as Director but at a nurse manager's salary.

_____

[4]      Central sterile supply is where dirty instruments are washed and sterilized, and then put back into sets to be returned for use in the next surgical case. (doc. 27 p. 16). In addition, CSS is responsible for materials management, which includes ordering new instruments, replacing instruments and dealing with missing instruments when the kits are returned used from surgery. (Id. p. 16-17).

In June of 2006, Denise Minor (Minor), a Caucasian, was hired as Brown's replacement for the position of Director. Brown was directly involved in the interviewing process and recommended Minor because she had been in various nurse manager roles, exhibited strong leadership qualities, and would help the department grow. (doc. 23-25). Upon her arrival in the Department, Minor spoke with the various nurse managers, including Brown. However, unlike the other nurse managers, Brown was unable to articulate a plan for her area even though she had been in the Department for a long time and had served as a director. (doc. 34-5 p. 25; 34-6 p. 2). Brown offers no evidence contradicting Minor's description of her conversation with Brown and the other nurse managers nor does Brown offer any evidence contradicting Minor's testimony that Brown was unable to articulate a plan. In fact, Brown cannot remember this conversation with Minor because "it wasn't that important." (doc. 23-3 p. 151). Minor came away from the conversation questioning Brown's management ability and reported her concerns to Mansfield. (doc. 34-5 p. 4). Minor and Mansfield decided to observe Brown and reassess the matter in a few weeks.

On June 21, 2006, Mansfield and Minor spoke with Brown about their concerns and expectations for her and after that meeting Brown was asked to prepare an action plan. Brown believed that the action plan was in order to inform Minor about what Brown's job entailed, not because there were any areas of concern that needed to be addressed. Brown prepared an action plan dated June 21, 2006. The plan included goals and outcome measures, apparently determined by Minor[5], and tactics and strategies prepared by Brown. (doc. 23-30; doc. 23-3 p.

---

[5]    The testimony is somewhat confusing on who prepared what section of the document. Brown states that she believes she was responsible for drafting the outcome measures but the document itself states that Brown was to provide the tactics/strategies for each outcome measure. (doc. 23-30 p. 2).

186).  The goals included "demonstrating supportive working relationship with senior leadership," "strategic planning and evaluation [of goals]," demonstrating sound decision making and positive communication.  (doc. 23-30 p. 1-2).  Brown did not agree with the goals set forth in the action plan and only created tactics and strategies to achieve those goals because she was told to do so. (doc. 23-3 p. 191). Brown has provided no evidence that she communicated her concerns to either Mansfield or Minor and in fact testified that she did not tell them that she did not agree with the goals and wrote her action plan "because this is what they wanted me to do, once again." (doc. 23-3 p. 187; <u>see also</u>, p. 223, stating "I didn't agree with any of [the action plan], but I didn't say anything. Whatever she wanted me to put on paper. . . was okay with me.").

On July 6, 2006, a revised action plan was created.  Brown again did not believe that many of the goals listed were necessary.  For instance, with regards to the goal that Brown demonstrate positive communication, Brown did not believe that there was a problem with communication that needed to be worked on.  (doc. 23-3 p. 198).  Minor included in the plan the need for Brown to increase volume and volume of surgeons, but Brown "did not even know what she was talking about." (<u>Id</u> p. 207).   Minor then noted that the tactics and strategies submitted by Brown would not assist her in meeting expected outcomes and further noted that Brown did not acknowledge that there was a pattern [of problems] in areas noted.  (doc. 23-30 p. 6).  Brown was required to revise the plan with new tactics and strategies due  July 10, 2006.  (doc. 23-30 p. 6).   Brown failed to submit the plan on time and received an email from human resources indicating that "this is [sic] type of thing that is concerning for Denise because you missed an important time line," and that "if you were not able to meet the time frame you should

have called Denise to let her know why and to arrange for a new date." (doc. 23-30 p. 7).

Brown submitted the plan on July 12, 2006 and did not believe that the failure to meet the

deadline was a problem because people were often late on turning things in and because no one

told her that it was a disciplinary action plan or that she could be fired for failing to turn a plan

in. (doc. 23-3 p. 212-214).[6] According to Brown, because she was not told that she could be

fired for failing to meet a required deadline for the action plan, "this wasn't the main thing on

[her] mind at the time." (Id p. 215). Nor did Brown feel that the action plan would improve her

job performance because she was already doing her job correctly before Minor's arrival. (Id p.

224).

   Frustrated with her job, Brown then sought a transfer to another department within the

OSU medical system. At the same time, Mansfield had determined that it was time to terminate

Brown from OSUMC East. On July 31, 2006, Brown, Mansfield, Minor and Kent Hess, Interim

CEO of OSUMC East, met to discuss Brown's work performance. Brown was presented with a

termination letter setting forth the grounds for her termination:

> "[D]eterioration of day-to-day decision making and lack of personal ownership continues
> to result in untimely completion of assignments, customer complaints, and general lack of
> control of the operating room/central sterile department and personnel." (doc. 23-31).

Brown requested a demotion but was told her only option was to resign, allowing her to remain

eligible for rehire. Brown then signed the attached resignation form which listed employee's

performance as "unsatisfactory" and stated "unsatisfactory performance in current role and

---

[6]      Brown repeatedly states that she was not warned about her impending demotion or job
loss in direct contravention of defendants' progressive discipline policy. According to Mansfield,
managers on Brown's level are at will employees and are not given progressive discipline. (doc.
32-8 p. 17-18). Haselwood agreed that the policy for discipline and termination varies depending
on what class of employee the supervisor is dealing with. (doc. 30-3 p. 16). Brown has provided
no evidence to the show that she was in fact entitled to progressive discipline.

responsibilities." (doc. 23-31 p. 2).[7] She was unable to find employment within the OSU hospital system. Brown was succeeded as nurse manager by Joyce Jackson, a Caucasian. Brown filed a timely charge with the Equal Employment Opportunity Commission (EEOC) and received a right to sue letter dated February 28, 2007. (doc. 23-32).

Plaintiff filed her complaint in this court alleging that she was terminated because she was African-American, in violation of 42 U.S.C. §2000e *et seq*, 42 U.S.C. §1981, 42 U.S.C. §1983 and Ohio Rev. Code § 4122.99. Defendants filed their Motion for Summary Judgment on September 30, 2008. Plaintiff filed her response on November 3, 2008 and defendants submitted a reply on November 12, 2008. In their motion for summary judgment, defendants asserts that plaintiff has no triable race discrimination claim.

## II.    Legal Standard

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See <u>LaPointe v. United Autoworkers Local 600</u>, 8 F.3d 376, 378 (6th Cir. 1993); <u>Osborn v. Ashland County Bd. of Alcohol, Drug Addiction & Mental Health Servs.</u>, 979 F.2d 1131, 1133 (6th Cir. 1992)(per curium). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case at issue, <u>LaPointe</u>, 8 F.3d at which may be accomplished by pointing out to the court that the nonmoving party lacks evidence to support an essential element of its case. <u>Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.</u>, 12 F.3d 1382, 1389 (6th Cir. 1993). In response, the nonmoving party must present "significant

[7]       Brown testified that she did not recall seeing the unsatisfactory remarks at the time she signed the document and that if she had, she would not have signed it. (doc. 23-3 p. 242-243).

probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989).

In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993)(quoting Anderson, 477 U.S. at 251-52). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. See also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## III.   Analysis of Federal Claims

Plaintiff brings her discrimination claim pursuant to 42 U.S.C. §2000e (Title VII) and 42 U.S.C. §1981 and §1983. Title VII "makes it an unlawful employment practice to discriminate against an individual on the basis of race, color, religion, sex, or national origin." Daniels v. Bd. of Educ., 805 F.2d 203, 207 (6th Cir. 1986) (citing 42 U.S.C. §2000e-2(a)). A Title VII claim may be made on the grounds of "disparate treatment," which essentially alleges that the "employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin." Id (quoting Teamsters v. U.S., 431 U.S. 324, 335-36 n.15 (1977)). 42 U.S.C. §1981 and 42 U.S.C. §1983 also afford remedies against discrimination in employment on the basis of race and require proof of purposeful discrimination. Daniels, 805 F. 2d at 207. Race discrimination claims arising under sections 1981 and 1983 are governed by the same order and allocation of proof applicable in a disparate treatment case under Title VII. Id.

The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. Id. If the defendant successfully presents a legitimate nondiscriminatory reason for its action, the burden returns to the plaintiff to prove that the reasons proffered by the defendant were a mere pretext for discrimination. McDonnell Douglas, 411 U.S. at 804-805. The parties are in agreement that the analysis is same with regards to both plaintiff's termination claim and demotion claim.

### A. *Prima Facie* Case

Defendants concede that plaintiff has established a *prima facie* case of discrimination with regards to her demotion claim. She is a member of a protected class, she suffered an

adverse employment action, of both a demotion and a termination, she is deemed to have been qualified for the position, and she was replaced by a person outside the protected class. See McDonnell Douglas, 411 U.S. at 802 (1973) (setting forth the four requirements for a *prima facie* case of discrimination).

      **B.    Legitimate Non Discriminatory Reason**.

      The reasons proffered by the defendants for the plaintiff's demotion and termination must be articulated with sufficient clarity and specificity to provide the plaintiff "a full and fair opportunity to demonstrate pretext." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255-56 (1981). However, defendants do not have to prove an absence of discrimination. Board of Trustees v. Sweeny, 439 U.S. 24, 25 (1978). Indeed, the employer's burden is light: it is "satisfied if he simply 'explains what he has done' or '[produces] evidence of legitimate nondiscriminatory reasons.'" Id at 25, n. 2 (internal citations omitted). Where the proffered reason is based on subjective criteria, the employment decision is subject to particularly close scrutiny where the evaluators themselves are not members of the protected minority. Grano v. Department of Dev., 699 F.2d 836, 837 (6th Cir. 1983).

      Defendants have articulated legitimate, non-discriminatory reasons for Brown's demotion and termination. According to Mansfield, Brown was demoted from Director because of her "response" to "increasing signs of problems in the perioperative area." (doc. 36-2 at ¶14). Brown either "could not accept that there were problems with the Perioperative Services that she had the ability to correct or compensate for, or she lacked the management skills to set goals, devise appropriate strategies, and gain the cooperation of her staff to achieve them." (Id). These conclusions were based on various events that occurred subsequent to her 2005 PACE in which

Brown was specifically told to address various concerns as raised in the Assessment. By December 1, 2005, Mansfield noted that goals in the action plan and assessment were not being met, that there was no change in overall turn over time (and surgeons had complained about this), the goal of decreasing late start times had not been met, and Brown had received lower than average staff satisfaction ratings. (doc. 35-27). In addition, surgeons had complained about various issues including difficulty with obtaining necessary equipment and lack of knowledge on the part of the OR staff with regard to how to operate equipment. (doc. 32-9 p. 208-212). Despite being told about these problems, and agreeing to work on remedying them, Brown did not believe there was a problem with her performance. (doc. 23-2 p. 112-122). Rather, she believed the problems were out of her control or were the result of Mansfield's failure to understand Perioperative Services. (doc. 23-2 p. 113, 115). Defendants have submitted documents, deposition testimony, and affidavits supporting the factual predicate for her demotion, such as her failure to respond to low staff satisfaction ratings and surgeon complaints, and she has failed to produce evidence to the contrary.

Brown was terminated from her position as nurse manager for similar reasons, including failure of day to day decision making, lack of personal ownership, untimely completion of assignments, customer complaints and lack of control of her department. (doc. 23-31). Brown was unable to articulate a plan for her area of the department, one of the main duties of the nurse manager position, was uninterested or unwilling to discuss strategic plans for the department with her supervisor, had received significant surgeon complaints, had failed to accept any responsibility for increasing surgical volume, had failed to adequately manage instruments and her budget, and despite these problems, generally felt that there was little room for improvement

in her performance. (doc 35-27). Again, Defendants have supported the factual predicate for plaintiff's termination with evidence which plaintiff has not rebutted.

Reasons such as lack of leadership and management skills, the failure to accept problems within her responsibility, untimely completion of assignments, and poor communication are legitimate non-discriminatory reasons for an employee's demotion or termination. See, Cole v. Abbott Labs., No. 2:03-CV-1225, 2006 U.S. Dist. LEXIS 86878 , *20 (S.D. Ohio Nov. 29, 2006) (legitimate nondiscriminatory reasons include repeated incidents of poor judgment, deficient leadership skills, and inappropriate conduct towards staff); Smith v. Mosaica Educ., Inc., No. 269764, 2007 Mich. App. LEXIS 632 (Mich. Ct. App. Mar. 6, 2007) (legitimate non-discriminatory reasons included employee's hostile attitude, low staff morale, lack of organization, failure to complete reports on time, failure to recognize own fault in problems that arose, inefficient communication, and poor leadership style); Wortham v. Integrated Health Servs., 302 F. Supp. 2d 854 (N.D. Ohio 2004) (legitimate nondiscriminatory reasons for not promoting plaintiff include that plaintiff was not a team player and was not a leader). Although plaintiff alleges that these reasons are subjective and therefore raise a question of fact as to pretext, a "subjective qualification assessment does not convert an otherwise legitimate reason into an illegitimate one." Dorsch v. L.B. Foster Co., 782 F.2d 1421, 1427 (7th Cir. 1986); see also, Wortham v. Integrated Health Services, 302 F. Supp. 2d 854 (N.D. Ohio 2004) ("even when a district court closely scrutinizes a case, that does not mean that employers cannot use subjective reasons in selecting employees").

Even if some of the defendants' proffered reasons may be considered subjective there is no evidence that these reasons are not the actual legitimate, non-discriminatory reasons behind

defendants' employment decisions.  Accordingly, the burden returns to the plaintiff to establish that the legitimate nondiscriminatory reasons offered by the defendants are merely pretext for racial discrimination.

### C.      Pretext

Under the burden shifting test, once defendant has established legitimate non-discriminatory reasons for plaintiff's demotion or termination, plaintiff is required to demonstrate by a preponderance of the evidence that the proffered reasons were mere pretext masking discriminatory conduct.  Bacon v. Secretary of Air Force, 785 F. Supp. 1255, 1264 (S.D. Ohio 1991)(citations omitted).   A plaintiff can demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003).  Brown relies primarily on the third ground, asserting that the reasons proffered by the defendant were insufficient to warrant a demotion or termination, because other employees,  particularly those not in the protected class, were not fired (or demoted) even though they engaged in similar conduct.  Gorski v. Myriad Genetics, Inc., No. 06-11631,  2007 U.S. Dist. LEXIS 42036 (E.D. Mich. June 11, 2007);  Espita v. P& G, 93 Fed. Appx. 707, 710 (6th Cir. 2004) (citations omitted) (in order to demonstrate that defendant's reason for termination was insufficient to justify a discharge, he must demonstrate "that a comparable non-protected person was treated better.").

### 1.      Plaintiff's attack on defendants' proffered legitimate non-discriminatory reasons is without merit.

In order for Brown to establish that the proferred reasons for her demotion and termination are pretext, she must attack the specific reasons proffered by the defendant for her demotion and termination. <u>Hershberger v. Altercare, Inc</u>., No. 2006CA00167, 2007 Ohio 1452 (Ct. App. Ohio Mar 26, 2007); <u>see also</u>, <u>Anderson v. Stauffer Chemical Co.</u>, 965 F.2d 397, 403 (7th Cir. 1992) (unless plaintiff" attacks the specific reasons given for a termination, a plaintiff who stresses evidence of satisfactory performance is simply challenging the wisdom of the employer's decision"). Plaintiff does not do so.

According to the defendants, plaintiff was demoted from her position as Director because of her response to increasing signs of problems in Perioperative Services. (doc. 36-2 ¶14). Specifically, Brown "either could not accept that there were problems with the performance of Perioperative Services that she had the ability to correct or compensate for, or she lacked the management skills to set goals, devise appropriate strategies, and gain the cooperation of her staff to achieve them." (<u>Id</u>). She was eventually terminated from her nurse manager position for a similar inability to accept responsibility for problems in the OR and CSS. Defendants have offered evidence that supports their reasoning for demoting/terminating Brown, namely, her response (or lack of response) to issues of concern within the Department and/or the OR and CSS.

Plaintiff does not dispute that, over the course of her tenure as Director, she was repeatedly alerted to the presence of various problems within the Department and failed to respond. In Brown's 2004 PACE, Mansfield included several areas of concern that Brown needed to work on in the following year, including improving patient satisfaction, enhanced oversight of materials management and consistency, setting achievable goals for the department

and improving communication, especially with administration, facilitating teamwork and improving implant pricing. (doc. 23-14). In an OR Meeting Agenda dated February 2005, Mansfield brought the fact that there was a decrease in surgical volume to Brown's attention. (doc. 23-13 p. 3; doc. 23-2 p. 214).

In her 2005 PACE, Brown was again notified of ongoing problems within the department, many of which were areas of concern noted by Mansfield in his Assessment. The 2005 PACE lists several areas of concern: staff satisfaction and morale, patient satisfaction scores, communication with staff and regarding staffing effectiveness, interaction with supervisors over equipment/supplies, building surgical volume, defensiveness, timely decision-making, and priority setting. (doc. 23-15). Mansfield also noted that he was concerned about the oversight of material management in the OR, noting that this was also a problem raised in the 2004 PACE. The 2005 PACE also includes a lengthy note on the lack of sufficient changes in staffing or productivity in relation to an under budget OR volume and the fact that the OR had lost its "efficiency edge." (Id). The PACE also noted the critical need for Brown to work to keep current surgeons excited about operating at OSUMC East, and "engaging new surgeons both during the recruitment process and shortly thereafter during initial/early OR cases." (Id p. 7). The PACE concluded with direction to create a "well-executed plan of change to regain the strength of perioperative services" and required Brown create an action plan to address the "specified areas" in her 2005 PACE. (doc. 23-15 p. 8). According to Mansfield, requiring an action plan is usually a signal that the issues with the employee are very serious. (doc. 32-8 p. 17).

Despite being more than adequately provided with what her job duties entailed, and what areas needed to be improved upon in the Department, Brown failed to recognize her duties and to adequately respond to problems which were specifically brought to her attention by her supervisor. Although Brown set goals in her two PACEs for improving the Department, she did not actually believe there was a problem with her performance. (doc. 23-2 p. 112-122). Rather, she believed the problems were out of her control or were the result of Mansfield's failure to understand Perioperative Services. (doc. 23-2 p. 113, 115). Mansfield's repeated concern about the variance between actual and budgeted volume of surgeries in the OR was clearly not something that Brown felt was her responsibility or concern, even though she actually included "building surgical volume" as one of her own goals in her 2005 PACE. (doc. 23-15 p. 5; but see, doc. 23-2 p. 214, "There's nothing I can do about it but if they bring in more surgeons;" doc. 23-3 p. 100, regarding concerns about surgeons who had left OSUMC East, and thereby affected volume, Brown states: "What does this have to do with me? I don't determine who practices."). Despite the fact that Brown was counseled that these were her job duties and she agreed to improve, she still failed to appreciate that any of the issues raised required a response. (doc. 23-2 p. 113, discussing her 2004 PACE and stating, "It doesn't mean that I had problems...Just because your boss mentions something, you can't perceive it as always problems.")

Brown responded similarly to other areas of concern raised by her supervisor. In her 2004 PACE, Brown was told that she needed to work to more effectively communicate her department's needs to her supervisors and to increase positive teamwork. (doc. 23-14). In her 2005 PACE, Brown was again reminded of the need to investigate facts and communicate them in a concise manner. Specifically, Mansfield noted that Brown needed to be clear in

communicating with her supervisor, especially in regards to supplies/equipment issues and surgeon demands. (doc. 23-15 p. 5). Brown was also told to adjust her communication style based on her listeners and to work on her defensiveness and communication regarding staffing effectiveness. (Id.). Brown herself included "continue to work on communicating facts in a clear and concise manner" as one of her own goals to work on. (Id). Nevertheless, despite making improved communication one of her goals, and despite Mansfield's concerns about Brown's communication problems, Brown believed that any communication problems were either not her fault or were not something she needed to work on. (Id at p. 140, stating she only wrote communication as a goal to work on because Mansfield wanted her to; Id at p. 144, stating that Mansfield's admonition that Brown work on communication with regard to requesting supplies, did not reflect on her, but rather reflected Mansfield's own lack of knowledge about the OR; Id at p. 145, stating that issues involving the need for to learn to work with other types of communications styles were not a concern to her because differing communication styles has nothing to do with her).

Mansfield also informed Brown that the operating room had lost its "efficiency edge" over the past year. (doc. 23-15 p. 7). "Efficiency" in the OR was one of the main areas of concern for Mansfield. (doc. 32-5 p. 6). In determining that the OR had lost its efficiency, Mansfield noted that several "quality indicators" were trending downward, including: decreased pre-operative prophylactic antibiotic timeliness and appropriateness, decreased percentage of total block time utilized, increased deviation from actual case length v. predicted length, decreased surgical volume, increased pre-incision time, increased turn over time, and increased percentage of late case starts. (doc. 35-13 p. 2; doc. 32-6 p. 18). Brown did not agree that the

OR had lost its efficiency edge, despite what Mansfield felt the quality indicators showed. (doc. 23-2 p. 157). Moreover, Brown did not believe that she was responsible for most of the problematic quality indicators. (doc. 23-3 p. 12, prophylactic antibiotic issues are the responsibility of anesthesia; p. 13, decrease of block time, increased case length, decreased surgical volume, increased pre-incision time, are all the responsibility or fault of the surgeons). According to Brown, the only measure of efficiency over which she had any control as Director of the entire perioperative department was "turnover time." (doc. 23-3 p. 14). Ironically, Brown also testified that all the areas of concern listed by Mansfield in the Assessment were all the responsibility of the Director. (doc. 23-3 p. 61, "I had to worry about the whole thing;" p. 62, "You're [as Director] always responsible."). However, in general, Brown felt that there was no problem with the "quality indicators" because there are always issues with these types of indicators in the OR. (Id).

Brown also failed to be concerned or to appreciate Mansfield's comment in the 2005 PACE that it was "time for a defined and well-executed plan of change to re-gain the strength of perioperative services" and that Brown needed to determine how to spend her energy to "help turn the department around." (doc. 23-15 p. 8). Brown testified that she was "still trying to figure out what was wrong with the department" and stated "I don't understand what he was saying by regaining the strength of the perioperative services." (doc. 23-2 p. 161). She did not believe that Mansfield's statement that the department needed to be turned around was even accurate. (Id; doc. 23-2 p. 165, stating, "it wasn't that bad. Based on my opinion of the operating room."). Just as with her 2004 PACE, Brown did not believe the issues raised in her

22

2005 PACE problems that needed to be addressed because she had received "meets expectations" ratings. (Id. at p. 158).

Once demoted from the position of Director, Brown continued to show a lack of acceptance of problems and/or the inability to proactively respond to those problems. When Minor first arrived in the Department, she asked the nurse managers to inform her of their goals for their various areas and Brown was unable to articulate a clear plan for her area. (doc. 34-5 at p. 25; doc. 34-6 p. 5). Minor sought out Brown's opinion on the 2005 Assessment, which related to areas within the OR and within Brown's sphere of duties. However, Brown was uninterested in discussing or addressing issues within the Assessment because she felt it had nothing to do with her and she had no ability to impact any change. (Id. at p. 5; see also doc. 23-3 p. 154, 156 Brown stating that the assessment "wasn't relevant to me" and that she couldn't understand why Minor wanted to go over something from 2005 when she had only been there a week). Brown was equally unresponsive when a meeting was held to discuss potential changes that would be occurring in the Department. (doc. 23-3 at p. 160-161, stating that she told Minor that whatever they want to do is fine "because it didn't involve my area" and "my opinion didn't matter because it didn't involve me"). Due to Brown's lack of a plan and the ongoing problems in the OR, she was asked to create another "action plan." However, Brown did not agree with most of the goals in the plan and created tactics and strategies that her supervisors did not feel would help her reach those goals. For example, Brown's tactics and strategies for reaching some of the goals were simply to "continue" doing what she believed she was already doing. (doc. 23-30). In addition, Brown turned her plan in after the deadline for doing so. (doc. 23-30 p. 7).

Other areas of concern were met with equal disinterest by Brown. For instance, in response to concerns Minor had about Brown ordering equipment that cost approximately $13,000.00 and well over her budget, Brown testified that she wasn't paying much attention to the equipment request when she approved it, and wondered "what the big deal" was. (doc. 23-3-p. 168-170). Brown was equally ambivalent about her staff's failure to attend a mandatory meeting regarding a nurse providing a physician with the wrong solution during surgery, stating: "[S]o we had to call risk management and quality and reschedule the meeting. We apologized. What's the big deal?" (doc. 23-3 p. 230).

Rather than disputing the actual reasons for her demotion and termination, Brown argues that there were other reasons that she should not have been fired. Specifically, Brown cites to "objective" measures of her performance which she alleges show that her performance as Director/Nurse Manager was positive. For instance, Brown alleges that under her leadership as Director, the net operating margin of the department rose significantly and was actually higher than under her predecessor. (Brown Aff. doc. 41 at ¶ 6). She also alleges that various "metrics" which measure performance of the department improved under her leadership.[8] Thus, Brown argues, the objective measures of her performance raise a material question of fact as to whether the reasons offered by defendant were mere pretext.

---

[8]     The plaintiff's brief is less than specific as to the "metrics" which she believes assist her case and/or those that she wants this court to consider. Rather, in a footnote plaintiff simply cites generally to a plethora of metrics-related testimony and exhibits for the court to review. (doc. 41 p. 5 n. 1). A district court is "not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108,. 111 (6th Cir. 1989). The court has, however, reviewed the metrics testimony and evidence and does not find it helpful to plaintiff's case.

Plaintiff's argument amounts to no more than that the defendants should use different criteria for determining her effectiveness. But a plaintiff "cannot show pretext by raising questions about the soundness of the employer's business judgment." Degrazia v. Ermanco, Inc., No. 91-2006, 1992 U.S. App. LEXIS 10265 (6th Cir. May 1, 1992). It is irrelevant whether revenue increased or that there were some improvements in some areas during her leadership[9], when there were other legitimate reasons for her demotion/termination. See e.g., Wright v. Sears, Roebuck & Co., 81 Fed. Appx. 37, 43 (6th Cir. 2003) (meeting or even exceeding certain standards set by the company, including positive sales figures, will not guarantee that an employee, especially a manager, is achieving the overall goals of the company and will not bar an employer from legitimating terminating such an employee for other legitimate non-discriminatory reasons).

Plaintiff, by her own testimony, admits that she failed to accept that there were problems with the performance of the department and that she had the ability to correct or compensate for those problems. (see doc. 36-2, setting forth the reasons for her demotion; doc. 23-31, setting forth the reasons for her termination). Instead she argues that she should have been retained because she performed well in other areas of the job. Such an argument is insufficient to demonstrate pretext.

### 2. Plaintiff has not established that similarly situated employees were treated differently.

---

[9] There is evidence that objective measures of performance were not positive under Brown. Under her leadership, the Department was under budget by $19,411,000.00 (doc. 23-3 p. 89) and supply costs were higher than they were previously or after her tenure as Director. (doc. 33-3 p. 4). Other quality indicators were also lower or worse under Brown than under Haselwood (doc. 32-5 p. 13-14) and there were more surgeon complaints under Brown than under either Haselwood or Minor. (doc. 32-8 p. 8).

In a further attempt to demonstrate pretext, plaintiff argues other employees who were similarly situated and outside the protected class, were not fired (or demoted) even though they engaged in similar conduct. <u>See</u>, <u>Gorski v. Myriad Genetics, Inc</u>., No. 06-11631, 2007 U.S. Dist. LEXIS 42036 (E.D. Mich. June 11, 2007). To be a "similarly situated" employee, the comparative employee "must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir. 1998). Plaintiff asserts that as Director, she was treated differently from her purported similarly situated comparatives, Haselwood and Minor. Brown also asserts that as nurse manager she was treated differently from comparatives Pratt and Ferraro. In making this argument, however, plaintiff once again fails to attack the proffered reasons for demotion/termination.

Plaintiff focuses entirely on the fact that some of the problems in the department which Mansfield brought to her attention and included in the 2004 and 2005 PACE and Assessment were also problems that existed under her comparatives. For instance, Brown asserts that both Haselwood and Minor received complaints from surgeons while they were Directors but were not disciplined or demoted. (doc. 23-2 p. 84). Brown argues that she handled surgeon recruitment issues exactly like Haselwood and Minor did, but she was the only one demoted based on surgical volume. She also alleges that quality indicators under her were equal to those under Haselwood and Minor but that she was the only Director asked to make an "action plan" or for whom an Assessment was written.

Brown makes similar arguments as to why the reasons offered for her termination as

nurse manager were also pretextual and focuses on two allegedly comparative Caucasian nurse

managers, Pratt and Ferraro. For instance, Brown asserts that Pratt also had staff morale issues

but Pratt was not terminated and that issues with lost instruments were ongoing and had

occurred under the other nurse managers. Brown also cites to the fact while she was asked to

prepare a written plan for her area, Ferraro or Pratt were not. According to Plaintiff, the only

difference between her and these allegedly comparative individuals is that Brown is African-

American and the comparative individuals are all Caucasian. Thus, she argues that the proffered

reasons were simply pretext for discrimination.

In order to raise a question of fact as to pretext, plaintiff must show that these

comparatives were similarly situated in all respects and that there were no mitigating

circumstances that would differentiate them. Ercegovich, 154 F.3d at 352. Plaintiff does not do

so and the evidence establishes that mitigating or differing circumstances did exist: namely, the

allegedly similarly situated individuals accepted responsibility for their job duties and for

problems in their areas and proactively responded to issues of concern.

As Director, plaintiff was repeatedly presented with her supervisor's concerns and areas

that needed to be improved upon in the department. Most of these concerns were ignored by the

plaintiff as not within her sphere of responsibility or because she did not believe problems

actually existed. In contrast, Haselwood and Minor both recognized what their job duties as

director entailed and proactively worked to improve areas of the department. For instance,

Brown testified that despite the several discussions with Mansfield about the surgical volume

deficiency, this was not a problem that she had any impact on. (doc. 23-2 p. 194, 195, stating

that she had nothing to do with surgeon recruitment and it was not her responsibility). At most,

plaintiff viewed her role to be limited to introducing the potential new surgeon to her area and to show them what the department had to offer. (doc. 23-2 p. 88-89). However, in her 2005 PACE, Brown specifically listed "building surgical volume" as a goal for her to work on and Mansfield specifically told Brown in that PACE that she was expected to "keep current surgeons excited about operating here and engaging new surgeons both during the recruitment process and shortly thereafter during inital/early OR cases." (doc. 23-15 p. 7).

In contrast to Brown's failure to appreciate her responsibility for surgeon recruitment, both Haselwood and Minor recognized surgeon recruitment and retention as part of their duties as Director. (Haselwood Depo at doc. 30-4, p. 5-6; Minor Depo doc. 34-3 p. 21-23. Haselwood, in contrast to Brown's very limited perception of her duties, testified that the director has responsibility to get surgery volume up and that this is done by working with the physician to show them OSUMC East is the best in the city, that the staff will work hard for them, they will have reasonable hours and that their patients will receive a high level of quality care. (doc. 30-4 p. 6).

With regards to surgeon complaints, Brown testified that surgeon complaints were often beyond her control or her responsibility. (doc. 23-3 p. 107 (surgeon complaints were the failure of administration; p. 109, surgeons should have complained to administration, not her). In contrast, Mansfield testified that under Haselwood, surgeon complaints were lower than under Brown, and that Minor reduced surgeon complaints by developing relationships with the surgeons (doc. 32-4 p. 182). Moreover, according to Mansfield, when problems were brought to Minor's attention, she responded and he saw "an individual that . . . recognized the problems,

and was working to solve them." (doc. 32-4 p. 116-117).[10]  In response, Plaintiff has provided

no evidence which would suggest that Haselwood and Minor failed take responsibility for

problems in the department.

In support of her position that she was treated differently than similarly situated nurse

managers, plaintiff focuses on two Caucasian managers, Pratt and Ferraro.  Brown generally

asserts that she was treated differently than Pratt and Ferraro because only Brown's work was

scrutinized and criticized and she was the only nurse manager asked to write a written plan for

her area.  Brown also again alleges that problems existed under Ferraro and Pratt but they were

not disciplined for those problems. Brown, however, has failed to show that Ferraro and Pratt

responded to problems in the same ineffective manner as she did.   There is, in fact, evidence to

suggest otherwise.

For instance, although Pratt did have problems with staff satisfaction, she was

immediately concerned and was engaged in finding a solution. (doc. 33-4 p. 4-5).  Brown cites to

the fact that Pratt had a mediator come into deal with her staff's morale issues as evidence that

Pratt should have been disciplined, but has no evidence that Pratt failed to work with the

mediator or effect a resolution.  Brown argues that instruments went missing under Ferraro's

management, but fails to show that Ferraro had an equally complacent attitude to that problem.

Brown viewed issues with instruments, whether missing or not working when a surgeon needed

them, as common occurrences that always happened or were not her responsibility, and

responded to the problem by simply ordering new equipment that was beyond her budget or by

---

[10]     This opinion is echoed by Pratt, who was supervised by Brown and later by Minor. Pratt
testified that Brown and Minor behaved differently as Directors and specifically, under Minor,
Pratt felt that there was "further progression in the OR, forward movement" and testified that
Minor had a vision and was helping the department grow. (doc. 25-2 p. 15-16).

threatening her staff. (doc. 23-3 p. 171, 173; see also doc. 34-10 p. 15, Minor stating that when she asked Brown about instrument issues, Brown responded "oh it's been that way for years.").[11] Brown's failure to adequately respond to Mansfield's concern about OR materials is also evident from the fact that in her 2005 PACE, it was noted that materials management had not improved even though she had been told to watch that area in her 2004 PACE. (doc. 23-15 p. 6). Ferraro on the other hand testified at length about her approach to solving problems in the department, including adjusting the handling of instrument maintenance to avoid problems, involving human resources in helping the staff improve morale, and making changes in rooms in order to improve customer satisfaction. (doc. 29-2).

Although plaintiff alleges that similarly situated employees had the same performance problems she did, she has failed to show that their response to these problems was as ineffective and complacent as her own. Therefore, she has again failed to demonstrate that the proffered reasons were pretext for discrimination.

### 3. Plaintiff's subjective beliefs and speculation are insufficient to establish pretext.

Much of the plaintiff's purported evidence of disparate treatment is based on her own subjective beliefs and speculation. However, speculation ungrounded in fact is insufficient to

---

[11]    Although there was some evidence that staff/surgeon satisfaction with instrument sets increased and defective sets decreased under Brown's leadership (doc. 23-15 p. 4), it was not until after Brown's departure as nurse manager that an effective new system for tracking instruments was implemented that saved $90,000.00 per year in lost or missing surgical instrument costs. (doc. 34-10 p. 12). Moreover the "zero-defect" system that Brown asserts directly addressed the issue, apparently did not result in a reduction of missing instruments. (doc. 27-2 p. 7).

establish pretext.  Hartsel v. Keys, 87 F.3d 795, 801 (6th Cir. 1996) (plaintiff cited lack of female department heads but has no knowledge of how many women applied; bases her belief on discrimination on "women's intuition" about "the tone of the whole situation" and "body language" and "vibes").  That is, "excuses and thinly-woven conspiracy theories" do not establish a genuine issue of disputed fact that the defendant's justification for demotion or termination was anything other than legitimate.  Upshaw v. Ford Motor Co., No. 1:04-cv-760, 2007 U.S. Dist. LEXIS 47025 (S.D. Ohio June 28, 2007); Chapin v. Nationwide Mut. Ins. Co., No. 2:05-cv-734, 2007 U.S. Dist. LEXIS 21176 (S.D. Ohio Mar. 26, 2007)(a plaintiff's generalizations, conclusory statements, and own subjective beliefs are insufficient to support a finding of discrimination).

For instance, Brown assumes that she was the only Director reprimanded for physician complaints, even though, for instance, Haselwood also had complaints made when she was Director.  Brown, however, has absolutely no idea whether Mansfield ever spoke or reprimanded Haselwood about those complaints and whether Haselwood responded proactively to those complaints.  (doc. 23-2 p. 84).   Brown complains that she was the only person Minor talked to about implementing a strategic plan for the Department, but in fact has no idea whether Minor ever talked to Pratt or Ferraro as well.  (doc. 23-3 p. 157).  In general, Brown's support for her claim is based on her feelings that she was being discriminated against.  Brown felt that she had no relationship with Mansfield because she was African-American and  "just didn't feel like" Mansfield was treating her "with respect or knowledge" but offered no specific basis for her feeling.  (doc. 23-2 p. 168).  Brown "felt" she was being treated differently than a Caucasian manager named Candy Mervine, but the basis for this feeling was entirely Brown's own

subjective belief in how Mansfield treated Mervine (doc. 23-2 p. 64, stating that she "believed" Mervine was never counseled for her performance, but has no actual evidence to support this belief). Brown assumed that Mansfield would automatically take the side of a Caucasian over an African-American but has no actual evidence to back that position up. (doc. 23-3-p. 144, stating "So of course I was wrong because I'm African-American and she's Caucasian. And [Mansfield] is going to take her word for it because she's white. That always happened there."). Brown also simply surmises, without any evidence to back up her opinion, that Minor treated her differently because Brown grew her hair into "locks" as a way of "emphasizing my African-American heritage" and because of her stronger African-American "tone." (doc. 23-3 p. 249).

Plaintiff's evidence is summed up by her own testimony about why she thought she might be terminated: "Because of the way [Minor] was acting. I've been in management enough to know if somebody is questioning everything you do and not questioning what the other Caucasians do, they're trying to get rid of you – *that's my assumption* – with no logical reason." (doc. 23-3 p. 250, emphasis added). Plaintiff has failed to raise a genuine issue of material fact with regards to whether the proffered reasons for her demotion were actual pretext for racial discrimination[12].

_____

[12]     It should be noted that the fact that Mansfield was the same actor who hired and demoted/terminated Brown provides a "strong inference. . . that discrimination was not a determining factor for the adverse action taken by the employer.'" Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 463 (6th Cir. 1995)(discriminatory reason was unlikely motivating factor in age discrimination case where same actor hired plaintiff at age 58 and fired him two years later). The court finds plaintiff's argument that Denise Minor was the main reason for her termination to be unpersuasive. Although a subordinate may use the formal decision maker "as a dupe in a deliberate scheme to trigger a discriminatory employment action" Roberts v. Principi, 283 Fed. Appx. 325 (6th Cir. Nov. 2008) (citing EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 484 (10th Cir. 2006), there is no evidence that this was the case here. Rather, Mansfield clearly had developed his own reasons for demoting and terminating Brown.

**IV.    Conclusion**.

Based on the foregoing reasons, the defendant's motion for summary judgment (doc. 36) is GRANTED. The clerk shall enter final judgment in favor of the defendants dismissing plaintiff's complaint with prejudice at Plaintiff's cost.

IT IS SO ORDERED.

S/ James L  Graham
James L. Graham
UNITED STATES DISTRICT JUDGE

Date: March 23, 2009